Filed 7/19/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| RAUL CAMACHO et al., | |
| Plaintiffs and Appellants, | G060892 |
| v. | (Super. Ct. No. 30-2017-00902499) |
| JLG INDUSTRIES INC., | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment and order of the Superior Court of Orange County, Robert J. Moss, Judge.  Reversed.

Greenberg and Ruby Injury Attorneys and Emily A. Ruby; Stalwart Law Group, Dylan Ruga and Brian Poulter; The Ehrlich Law Firm and Jeffrey I. Ehrlich for Plaintiffs and Appellants.

Tucker Ellis and Peter L. Choate; McCoy Leavitt Laskey and Jeffrey E. Zinder; McCoy Leavitt Laskey, Brook Laskey and Stephanie Demers for Defendant and Respondent.

\*　　　　\*　　　　\*

"'"'A product . . . is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor . . . .'"'" (*Trejo v. Johnson & Johnson* (2017) 13 Cal.App.5th 110, 142 (*Trejo*).)

Workers often fail to take safety precautions, even when the danger may be apparent. No worker would intentionally put her hand in a position to be crushed by an industrial punch press machine, but that risk of injury is foreseeable. (See, e.g., *Gonzalez v. Seal Methods, Inc.* (2014) 223 Cal.App.4th 405, 407–409.) That is why manufacturers often design industrial machines with safety devices that require workers to place both of their hands on the controls in order to activate the machine. (*Ibid.*)

Raul Camacho was installing glass panels when he fell out of a scissor lift manufactured by JLG Industries Inc. (JLG). Camacho failed to latch a chain that was designed to guard the lift's entrance (as shown in appendix A). Camacho sued JLG for strict products liability, failure to warn, and related claims.

At a jury trial, Camacho alleged the scissor lift as designed with the chain invited human error, and the foreseeable risk of harm could have been avoided if JLG had marketed only its alternative design with a self-closing gate (as shown in appendix B). Camacho also alleged there was a defective warning label on the lift. At the close of evidence, JLG moved for a directed verdict. The trial court granted the motion. The court ruled in order to show causation Camacho needed to prove if the chain been latched, "the accident would have happened anyway." We disagree.

To overcome the directed verdict motion, Camacho only needed to make a prima facie showing that the scissor lift as designed with a chain was a substantial factor in causing his injuries. That is, Camacho only needed to make a prima facie showing that the alternative design with the self-closing gate would have prevented his fall. Under a risk-benefit test, it was then JLG's burden to prove the benefits of the chain outweighed its risks. (See *Chavez v. Glock, Inc.* (2012) 207 Cal.App.4th 1283, 1302–1303.)

2

We find Camacho made a prima facie showing of causation. Based largely on the photographs, it appears the scissor lift as designed with the chain was a substantial factor in causing Camacho's injuries. That is, the jury could have reasonably inferred that had a self-closing gate been in place, Camacho's fall would have been prevented. Of course, we are uncertain how the jurors would have ultimately decided the issue, but they should have been permitted to do so. (See *Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 120 (*Campbell*) ["Unless very unusual circumstances exist, this type of claim presents a factual issue which can only be resolved by the trier of fact"].)

We also find the jurors could have reasonably inferred JLG's allegedly defective warning label was also a substantial factor in causing Camacho's injuries.

Thus, we reverse the judgment and direct the trial court to vacate its order granting JLG's motion for a directed verdict.

I

FACTS AND PROCEDURAL HISTORY

In December 2015, R. Gillette was a project manager for a subcontractor hired to do the glazing work (glass installation) for a new hotel being built in Huntington Beach. Gillette supervised 15 to 20 glazers, with crews in various areas of the hotel.

On December 7, 2015, two new hires arrived at the job site, T. Figueroa, and Camacho. Gillette conducted a 30-minute orientation regarding the scissor lift the two men were about to use. Gillette "showed them how to latch the chain and told them that the chain had to be latched at all times." Both men demonstrated to Gillette that they were capable of operating the lift.

Because Figueroa had more experience, it was decided he would take the lead of the two-man crew and operate the scissor lift, which had a platform that was 30 inches wide by six feet long. Figueroa could raise or lower the platform using a control panel at the opposite end from the entrance. An upper-level guard rail (42 inches high)

3

surrounded all four sides of the platform. A mid-level guard rail (21 inches high) and a four-inch toe board surrounded three sides of the platform. There was not a mid-level guard rail, nor a toe board, at the lift's entrance.

When installing glass panels, glazers typically set the glass on material (dunnage) so it will not be damaged. Drywall can be used as dunnage, but Gillette preferred wooden two-by-fours because they elevate the glass panels off the platform, making the glass easier to pick up. Throughout the day and into the following day, Gillette periodically watched Figueroa and Camacho using the scissor lift as they installed glass panels in the lobby. At all times, the chain on the scissor lift was latched at the entrance and two-by-fours were being used as dunnage.

On their second day on the job, at about 3:50 p.m., Figueroa and Camacho were on the platform, which was about 12 feet off the ground. They both picked up a large glass panel they were about to install. As the two men were lifting the glass panel, Camacho fell off the lift through the entrance. Figueroa saw Camacho "when he started going down. I saw him falling."[1]

The general contractor's superintendent assisted in an investigation of the accident. The superintendent had worked at construction sites for over 30 years. Part of his job was to document safety issues. The superintendent said a common safety issue was workers failing to latch the chain on scissor lifts; in fact, he had seen that occur at every project.

A photograph of the scissor lift taken just after the accident showed there were three glass panels near the entrance (as shown in appendix C). The superintendent said, "the chain was trapped behind a piece of glass." There was also drywall on the platform being used as dunnage, which was broken at the lift's entrance.

---

[1] It was stipulated that: "Plaintiff Camacho fell through the entrance of the scissor lift as he and Mr. Figueroa were attempting to lift a pane of glass to install."

*Court Proceedings*

Camacho sued JLG for strict products liability, failure to warn, and related claims. Camacho's wife sued JLG for loss of consortium.

At the start of a jury trial, Camacho's counsel said: "Our theory of liability with respect to the chain . . . is that it invites human error." Counsel said there was an available alternative safer design: "a spring loaded self-latching gate with a . . . toe board." JLG's counsel responded: "Either one, chain or gate, is safe when used properly." The parties stipulated Camacho suffered a brain injury as the result of his fall. Figueroa testified as a percipient witness. Camacho was unable to testify due to his injuries. Both parties presented expert witness testimony (some portions will be summarized in the discussion section of this opinion).

At the close of evidence, JLG moved for a directed verdict. The trial court granted the motion, finding Camacho "failed to present substantial evidence of causation and that JLG is entitled to a directed verdict on all . . . causes of action."

II

DISCUSSION

Camacho contends the trial court applied the wrong legal standard regarding causation as to his design defect and failure to warn claims. We agree.

A trial court cannot grant a defendant's motion for a directed verdict if there is substantial evidence in the record to support the plaintiff's claims. (See *Diego v. City of Los Angeles* (2017) 15 Cal.App.5th 338, 349.)

Our review is de novo. (See *Los Angeles Unified School Dist. v. Torres Construction Corp.* (2020) 57 Cal.App.5th 480, 509.) "The rules for reviewing a directed verdict are fairly strict." (*O'Shea v. Lindenberg* (2021) 64 Cal.App.5th 228, 235 (*O'Shea*).) The evidence of the party opposing the motion """"must be accepted as true and conflicting evidence must be disregarded."""" (*Ibid.*) "Unless it can be said that, as a

5

matter of law, no other reasonable conclusion is legally deducible from the evidence . . . a court is not justified in taking a case from a jury and itself rendering the decision." (*Hunt v. United Bank & Trust Co.* (1930) 210 Cal. 108, 117.)

In this discussion, we shall:  A) review relevant legal principles; B) summarize additional trial evidence; and C) analyze the facts as applied to the law.

*A.  Relevant Legal Principles*

Products liability law broadly refers to a manufacturer's legal responsibility for injuries resulting from the use of a product.  (See *Greenman v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 63.)  "The purpose of such liability is to ensure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons . . . ."  (*Ibid.*)

"Under California law, a manufacturer is strictly liable for injuries caused by a product that is (1) defectively manufactured, (2) defectively designed, or (3) distributed without adequate instructions or warnings of its potential for harm."  (*Arnold v. Dow Chemical Co.* (2001) 91 Cal.App.4th 698, 715–716.)

"A design defect exists when the product is built in accordance with its intended specifications, but the design itself is inherently defective."  (*Chavez v. Glock, Inc.*, *supra*, 207 Cal.App.4th at p. 1303.)  "'"A product . . . is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor  . . . ."'"  (*Trejo*, *supra*, 13 Cal.App.5th at p. 142.)

In some defective design cases, "the feasibility of a reasonable alternative design is obvious and understandable to laypersons and therefore expert testimony is unnecessary to support a finding that the product should have been designed differently and more safely.  For example, when a manufacturer sells a soft stuffed toy with hard plastic buttons that are easily removable and likely to choke and suffocate a small child

6

who foreseeably attempts to swallow them, the plaintiff should be able to reach the trier of fact . . . without hiring an expert to demonstrate the feasibility of an alternative safer design." (Rest. 3d Torts, Products Liability (1998) § 2, com. f, p. 23.)

"Three methods may be utilized in order to demonstrate a design defect: (1) the consumer expectations test shows that the product failed to perform as safely as an ordinary consumer would expect . . . ; (2) the risk-benefit test balances the risk of danger inherent in the challenged design versus the feasibility of a safer design, the cost of a safer design, the gravity of the danger, and the adverse consequences to the product of a safer design; and (3) the failure-to-warn test imposes upon the manufacturer or retailer liability for the failure to warn of known or knowable inherent dangers in the product." (*Arnold v. Dow Chemical Co.*, *supra*, 91 Cal.App.4th at pp. 715–716.)

A plaintiff has the initial burden to prove a defendant's product design proximately caused the injury. (See *Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 432.) Proximate cause requires a showing that the alleged wrong was "a substantial factor in producing the injury." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*).) The plaintiff need not "disprove every possible alternative explanation of the injury." (*Campbell*, *supra*, 32 Cal.3d at p. 121.) Causation "'may logically and reasonably be inferred from the circumstantial evidence. [Citations.] . . . The mere fact that other inferences . . . might be drawn does not render the inference favorable to the plaintiff too conjectural or speculative for consideration [by the jury].'" (*Ibid*.)

Under the risk-benefit test, once causation is shown, it is the defendant's burden to establish that the benefits of the challenged design outweigh its risks. (*Barker v. Lull Engineering Co.*, *supra*, 20 Cal.3d at p. 431 ["a jury may consider, among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design"].)

7

A product may also be dangerous because it lacks adequate warnings. (*Bunch v. Hoffinger Industries, Inc.* (2004) 123 Cal.App.4th 1278, 1302–1303 [the adequacy of a warning label is an issue of fact for the trier of fact].) However, manufacturers have no duty to warn of obvious hazards. (*Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56, 67.) Under either a strict liability or a negligence theory, "it must appear that the failure to warn was a legal cause of the injury." (*Torres v. Xomox Corp.* (1996) 49 Cal.App.4th 1, 16.) "A tort is a legal cause of injury only when it is a substantial factor in producing the injury." (*Soule*, *supra*, 8 Cal.4th at p. 572.)

B. *Additional Trial Evidence*

The scissor lift in this accident (as designed with a chain and no toe board at the entrance), was manufactured by JLG in 2008 (as shown in appendix A). JLG also manufactured an alternative model, which was designed with a spring-loaded self-closing gate at the entrance, and a toe board that extended across the entrance when the gate was shut (as shown in appendix B). JLG also sold an aftermarket gate-and-toe-board retrofit kit to replace the chain. The kit was $154 and could be installed in about six minutes.

A warning label was located on the JLG scissor lift to the left side of the operator controls (about six feet away from the entrance where the latch and the chain were located). The "falling hazard" portion of the placard warned users to: "Ensure entrance area is properly closed." The placard included no specific warning to users of the lift that they needed to latch the chain.

A human factors expert testified human error is inevitable, so a hazard-management hierarchy is typically used when designing products. The first approach is to remove the hazard entirely, so users are not required to take any affirmative efforts to avoid the hazard. When it is not feasible to eliminate the hazard, the second approach is to design a barrier to separate the user from the hazard (e.g., a guard that fits over the blade of a table saw). The third level of the hierarchy, which should be used only when it

is not practical to address the hazard at a higher level, is to provide a warning to the user of the product to avoid the hazard.

The human factors expert said that a passive system (e.g., a self-closing gate) is much safer than an active system (e.g., a manual chain with a latch) because "as humans we make mistakes, all of us do, and as a result, we can't count on every single human to do every single behavior right 100 percent of the time." The absence of a toe board at the entrance of the scissor lift also posed a safety risk because the toe board allows users to get a "kinesthetic sense" of where the edge of the platform is without having to look. Moreover, the top-level guardrail of the scissor lift provided a false sense of security to users. This is because users may perceive that it provides adequate fall protection without using the chain.

The human factors expert said a warning "needs to be near the location of the hazard." The expert testified "if you're up in the air, then the hazard of falling is open and obvious. What's not open and obvious is . . . what the chain does and doesn't do, and how to safely protect yourself from that fall hazard."

A biomechanics expert analyzed the differences between having the chain at the entrance of the scissor lift with no toe board, versus having a self-closing gate with a toe board. The expert testified because there was no toe board at the entrance, even if the chain had been latched, it was possible for Camacho to have fallen out of the lift underneath the chain. The expert opined that if the scissor lift had been equipped with a self-closing gate with a toe board (as opposed to just the chain and no toe board), then Camacho would not have fallen out at the entrance.

A safety engineering expert testified there is a very high probability that a user will stand near the opening of a small scissor lift. Given the risk of serious injury or even death, the expert opined JLG should have attempted to reduce the fall risk to "as low as reasonably practicable." The expert testified "a chain with no toe board [that relies] on somebody to remember every single time to put across is clearly inferior from a

safety point of view than [a] design [with] a swinging gate."  The expert also said, "I've actually seen, I believe, more scissor lifts without the chains latched out in the field . . . than latched."  The expert said, "it's very foreseeable" workers will neglect to latch the chain:  "I see it a lot.  In fact, when I confront people, sometimes they laugh at me and say that chain's not doing anything."[2]

*C. Analysis and Application*

The facts are not complicated.  Camacho neglected to latch a chain across the entrance of a JLG scissor lift.  Camacho then fell out of the lift's entrance as he and Figueroa were picking up a glass panel.  The legal analysis is similarly straightforward.

As far as the defective design claim, based on the evidence presented at trial, we find the jury could have reasonably inferred JLG's scissor lift as designed with the chain and no toe board at the entrance was a substantial factor in causing Camacho's injuries.  In other words, it is a reasonable inference that JLG's alternative design with a self-closing gate would have prevented Camacho from needing to latch the chain, and the toe board would have further prevented him from not realizing he was at the edge of the platform just before he fell.  (See *Campbell*, *supra*, 32 Cal.3d at p. 120.)

As far as the failure to warn claim, the warning label on JLG's scissor lift did not explicitly warn users to latch the chain, and the placard was six feet away from where the latch and the chain were located.  Again, it is a reasonable inference that had JLG's warning label explicitly warned Camacho of the need to latch the chain, and had it been placed near the entrance, then Camacho may have heeded the warning, latched the

---

[2] We have generally disregarded the evidence presented by JLG at trial.  (*O'Shea*, *supra*, 64 Cal.App.5th at p. 235 [courts are to disregard a moving party's contradictory evidence in a motion for a directed verdict].)  For instance, we are disregarding evidence of any alleged contributory negligence (e.g., Camacho's use of drywall as dunnage), or any evidence JLG's scissor lift as designed with the chain complied with then-current safety standards issued by the American National Standards Institute (ANSI).

10

chain, and not have fallen off the lift.  (See *Soule*, *supra*, 8 Cal.4th at p. 572.)

In short, we hold that the trial court erred when it granted JLG's motion for a directed verdict because there was substantial evidence of causation.  Thus, we reverse the judgment and order the court to vacate its order granting the motion.

JLG argues Camacho "did *not* present substantial evidence that a gate would have prevented Camacho's injury."  We disagree.

Even without any express witness testimony, we think the jury could have looked at the photographs and reasonably inferred Camacho would not have fallen out of the scissor lift if it had been equipped with a self-closing gate and a toe board at the entrance.  (See *Pietrone v. American Honda Motor Co*. (1987) 189 Cal.App.3d 1057, 1061–1062 [effectiveness of alternative design was "so self-evident as to obviate the need to present express testimony, expert or otherwise"].)

Further, there was compelling witness testimony to support Camacho's claims.  Figueroa testified the chain was not latched when Camacho fell off the scissor lift.  The general contractor's superintendent said he had seen workers fail to latch chains on scissor lifts at every job site.  The human factors expert testified the most effective way to deal with a safety hazard is to remove it, and the passive self-closing gate "would have eliminated the hazard."  The biomechanics expert explicitly opined if the lift had been equipped with the self-closing gate with a toe board at the entrance, then Camacho would not have fallen out.  Similarly, the safety engineering expert testified, "a chain with no toe board [that relies] on somebody to remember every single time to put across is clearly inferior from a safety point of view than [a] design [with a] swinging gate."

As to causation, Camacho plainly made a *prima facie* showing under any possible definition of that term.  (See *Evans v. Paye* (1995) 32 Cal.App.4th 265, 280, fn. 13 ["[p]rima facie evidence is that which will support a ruling in favor of its proponent if no controverting evidence is presented"]; see also Black's Law Dict. (7th ed. 2004) p. 1209, col. 1 [a "prima facie case" is a "production of enough evidence to allow the

11

fact-trier to infer the fact at issue and rule in the party's favor"].)

JLG also argues the Supreme Court's analysis in *Campbell*, *supra*, 32 Cal.3d 112, does not apply because Camacho "did *not* contend the lift was defectively designed due to the *absence* of a safety device." JLG is mistaken. That was precisely Camacho's contention. And just as in *Campbell*, the trial court in this case erred by not allowing the defective design claim to go to the jury.

In *Campbell*, the plaintiff was a 62-year-old bus passenger who sat in "the first forward-facing single seat on the right side of the bus." (*Campbell*, *supra*, 32 Cal.3d at pp. 115–116.) Most seats had a metal bar in front of the passenger at shoulder level that was attached to the back of the seat just in front of the passenger. However, because of where she sat: "The only handrail directly in front of plaintiff was the metal armrest attached—at about waist level—to the side of this seat." (*Ibid*.) When the bus made a sharp turn, rather than relying on the handrail at her waist level, the plaintiff reached out at shoulder level. Unfortunately, "'[t]here was nothing there to grab.'" (*Ibid*.)

The plaintiff was injured and sued the defendant bus manufacturer. (*Campbell*, *supra*, 32 Cal.3d at p. 116.) The plaintiff's strict products liability theory was that "the bus was defective in design because it *lacked a particular safety device* that would have prevented the accident." (*Id*. at p. 120, italics added.) At a jury trial, the plaintiff testified and provided "photographs of the bus." (*Id*. at p. 116.) At the end of the plaintiff's case, defendant moved for a judgment of nonsuit. The defendant "contended that plaintiff had failed to introduce evidence sufficient to establish that the bus was defective in design or that the alleged defect was a proximate cause of plaintiff's injuries." (*Id*. at p. 117.) The trial court granted the motion. The Supreme Court disagreed. The Court found the plaintiff was not required to put on any expert testimony and she did, in fact, "establish a prima facie case of causation." (*Id*. at pp. 119, 125.)

The *Campbell* court held, "there was sufficient evidence from which the jury could infer that the lack of a restraining pole or rail within plaintiff's reach was a

12

proximate cause of the injury. Plaintiff's seat, unlike the other forward-facing seats, did not have a metal 'grab bar' at shoulder level in front of it. There was also no vertical pole in front of the seat. As she was being propelled from her seat, plaintiff reached for some object to grab on to, but found none. From this evidence, the jury could reasonably conclude that if a bar or pole had been present, plaintiff would not have been thrown to the other side of the bus and injured." (*Campbell*, *supra*, 32 Cal.3d at p. 124.)

"Unless very unusual circumstances exist, *this type of claim* presents a factual issue which can only be resolved by the trier of fact." (*Campbell*, *supra*, 32 Cal.3d at p. 120, italics added.) "It is particularly appropriate that the jury be allowed to determine the inference to be drawn when the evidence indicates that a safety device, designed to prevent the very injury that occurred, was not present. To take the case from the jury simply because the plaintiff could not prove to a certainty that the device would have prevented the accident would enable the manufacturer to prevail on the basis of its failure to provide the safeguard." (*Id.* at p. 121.) "Such a rule would provide a disincentive to improve the safety features of a product and thereby interfere with one of the major policy goals of strict liability." (*Ibid.*)

In *Campbell*, the plaintiff established a prima facie case showing the absence of a particular safety device in a bus (a bar or a pole at shoulder level) likely would have prevented her injuries, as opposed to the alternative design (a metal handrail at waist level) that did not prevent her injuries. (*Campbell*, *supra*, 32 Cal.3d at p. 120.) Camacho likewise established a prima facie case showing the absence of a particular safety device in a scissor lift (a self-closing gate with a toe board) likely would have prevented his injuries, as opposed to the alternative design (a manual chain with no toe board) that did not prevent his injuries. In *Campbell*, the Court held that the jury could have reasonably inferred that the design of the bus (without a bar or a pole at shoulder level) was a substantial factor in causing the plaintiff's injuries. (*Ibid.*) In this case, we similarly hold that the jury could have reasonably inferred that the design of the scissor

13

lift (without a self-closing gate or toe board at the entrance) was a substantial factor in causing Camacho's injuries. Thus, the Court's analysis in *Campbell* is supportive of our analysis that Camacho presented substantial evidence of causation.

JLG also argues: "Because Camacho and Figueroa did not use the chain when the accident occurred [citation], a defect in the chain design could *not* have caused Camacho's injury." We disagree.

JLG appears to fundamentally misapprehend Camacho's products liability design defect claim, at least in its appellate briefs. Camacho's theory of liability was not that the chain—itself—was somehow defective or defectively designed. Indeed, as JLG's counsel recognized at the beginning of the jury trial: "So to begin it might help if I start by telling you why we're not here today. We are not here today because the scissor lift that was being used broke or malfunctioned in any way."

Rather, Camacho's claim is the scissor lift was "built in accordance with its intended specifications, but *the design itself* is inherently defective." (See *Chavez v. Glock, Inc.*, *supra*, 207 Cal.App.4th at p. 1303, italics added.) In other words, Camacho's products liability claim was that the scissor lift as designed with the chain was inherently defective *because it was highly foreseeable he would not latch the chain*, and that dangerous design defect is what caused his injuries. Camacho also claimed JLG could have easily avoided the need for him to manually latch the chain by marketing only its alternative passive design with the self-closing gate that would have added about $154 to the cost. (See *Trejo*, *supra*, 13 Cal.App.5th at p. 142 ["""A product . . . is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design"""].)

JLG's reliance on *Visueta v. General Motors Corp.* (1991) 234 Cal.App.3d 1609 (*Visueta*), is not persuasive. In *Visueta*, a driver of a car was killed in a traffic collision. The victim's car was struck by a flatbed truck when the truck's poorly maintained hydraulic brakes failed. (*Id*. at p. 1612.) The victim's estate sued the truck

14

manufacturer for products liability on a theory "that the lever to the [inoperable] parking brake was installed in an inaccessible location, making it 'impossible to reach during an emergency.'" (*Ibid*.) The trial court found no triable issue of fact existed as to causation. (*Ibid*.) The appellate court agreed: "Even if the trial court assumed the location of the brake lever constituted a design defect, causation was absent here." (*Id*. at p. 1613.) "Because the parking brake was inoperable due to the improper maintenance, it made no difference where the parking brake lever was located." (*Id*. at p. 1617.)

Unlike the hydraulic brakes in *Visueta*, there was no suggestion in this case that Camacho attempted to latch the chain on the scissor lift and the mechanism somehow failed because it was poorly maintained. Further, unlike the inoperable emergency parking brake in *Visueta*, there was no evidence to suggest that had a self-closing gate been in place at the lift's entrance, it would have been somehow inoperable and/or ineffective. Therefore, the *Visueta* opinion does not alter our analysis.

JLG also argues: "Camacho did not testify, and there is *no* evidence as to why he did not latch the chain. Similarly, Figueroa did *not* testify he forgot to latch the chain . . . . In fact, *no* witness testified about why Camacho and Figueroa failed to latch the chain." While factually true, this argument is a red herring.

It is undisputed the chain was not latched when Camacho fell out of the scissor lift. Although Camacho did not testify, it does not matter whether the chain was not latched because he forgot, because he decided it was unnecessary, because the glass got in the way, or any other possible reason.[3] Camacho's design defect theory was that the active safety device (the manual chain) invited human error—regardless of the reason—and the design was dangerous given the reasonable alternative passive safety device (the self-closing gate) that would have prevented his fall and severe injuries.

As to the failure to warn claim, JLG argues causation cannot be established

_____

[3] The dissenting opinion repeatedly states that we *infer* that Camacho *forgot* to latch the chain. Respectfully, we make no such inference.

15

unless there is some evidence a plaintiff, "read and relied on the allegedly inadequate warning." JLG argues, "there is *no* evidence Camacho read or relied on the placard or any of the other safety information provided by JLG." We disagree.

On the day before the scissor lift accident—Camacho's first day on the job—Gillette gave a 30-minute orientation as to the scissor lift, and Camacho demonstrated he was able to operate the controls. This means Camacho was in close proximity to the warning label for some meaningful period of time. While there is no direct evidence Camacho observed the warning label, we find there is substantial circumstantial evidence to support that reasonable inference. (See *County of Kern v. Jadwin* (2011) 197 Cal.App.4th 65, 73 ["substantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom"]; see also *O'Shea*, *supra*, 64 Cal.App.5th at p. 235 ["The rules for reviewing a directed verdict are fairly strict"].)

JLG also argues: "There is no duty . . . to warn about a risk that is objectively obvious or known to the plaintiff. Here, the risk of serious injury from falling through an unguarded entrance on the subject lift was obvious to anyone using the lift." We disagree because this is a disputed issue of fact.

While Camacho's human factors expert acknowledged, "the hazard of falling is open and obvious"; the expert clarified: "What's not open and obvious is . . . what the chain does and doesn't do, and how to safely protect yourself from that fall hazard." The expert further testified the top-level guardrail of the scissor lift provides a false sense of security to users. Moreover, the safety engineering expert testified, "it's very foreseeable" workers will neglect to latch the chain: "I see it a lot. In fact, when I confront people, sometimes they laugh at me and say that chain's not doing anything."

The risks of failing to latch the chain, and whether the danger was open and obvious—such that the lift should (or should not) have included a specific warning to latch the chain—was plainly a disputed factual issue. Given the standard for a directed verdict, we find it was an error for the trial court to have taken that disputed factual issue

16

away from the jury. (See *Hunt v. United Bank & Trust Co.*, *supra*, 210 Cal. at p. 117 ["Unless it can be said that, as a matter of law, no other reasonable conclusion is legally deducible from the evidence . . . a court is not justified in taking a case from a jury and itself rendering the decision"]; see also *Morson v. Superior Court* (2001) 90 Cal.App.4th 775, 787 ["'The mere fact that a risk presented by a product design is open and obvious . . . does not prevent a finding that the design is defective'"].)

Finally, we note that during oral argument an interesting hypothetical question arose. Many newer cars and trucks include a safety feature that detects another vehicle in an adjacent lane. A "blind spot indicator" then notifies the driver of the potential danger. The hypothetical question was: what if there is an accident in a vehicle without a blind spot indicator, can a plaintiff sue the manufacturer claiming the vehicle was defective because it lacked this relatively new safety feature?

We think the answer is undoubtedly yes. That is, a plaintiff could certainly *initiate* or *file* such a hypothetical lawsuit. As the California Supreme Court has expressly emphasized, one of the major policy goals of strict products liability tort litigation is "to improve the safety features of a product."[4] (*Campbell*, *supra*, 32 Cal.3d at p. 121.) Indeed, "the concept of strict products liability was created and shaped judicially." (*Daly v. General Motors Corp.* (1978) 20 Cal.3d 725, 733.)

However, we are uncertain whether a plaintiff could *prevail* or *win* in a hypothetical defective design lawsuit involving a blind spot indicator. In order to overcome a motion for nonsuit, the plaintiff would first need to make a prima facie showing that the current design of the vehicle (presumably with standard mirrors) was a substantial factor in causing his or her injuries (a blind spot indicator likely would have

---

[4] Interestingly, Camacho's fall from the scissor lift with the chain at its entrance occurred in 2015. But as discussed by the parties during motions in limine, ANSI revised its standards in 2020. The relevant ANSI safety standard now apparently calls for all scissor lifts to include a self-closing gate and a toe board at the entrance.

17

prevented the accident). Assuming the plaintiff met that burden, the manufacturer would then undoubtedly present evidence regarding the risks, benefits, and relative costs of the two alternative safety designs. Ultimately, we trust that a hypothetical jury would then fairly evaluate the facts after being instructed on the law. (See *Delli Paoli v. United States* (1957) 352 U.S. 232, 242 ["Based on faith that the jury will endeavor to follow the court's instructions, our system of jury trial has produced one of the most valuable and practical mechanisms in human experience for dispensing substantial justice"], overruled on another point in *Bruton v. United States* (1968) 391 U.S. 123, 123–126.)

To reiterate and conclude as to Camacho's lawsuit, we find substantial evidence of causation. The jury could have reasonably inferred JLG's scissor lift as designed with the chain and no toe board was a substantial factor in causing Camacho's injuries. The jury could have also reasonably inferred JLG's failure to adequately warn Camacho of the danger of not latching the chain was also a substantial factor in causing his injuries. Thus, we hold the trial court erred by granting JLG's motion for a directed verdict and not allowing these disputed factual issues to go the jury.

### III

### DISPOSITION

We reverse the judgment and order the trial court to vacate its order granting a directed verdict as to Camacho's causes of action.[5] Camacho is entitled to recover his costs on appeal.


                                             MOORE, J.

I CONCUR:


GOETHALS, J.

---

[5] Because of our disposition, we need not address Camacho's additional claim on appeal that the trial court erred by excluding evidence of two prior accidents involving similar JLG scissor lifts. (See Evid. Code, § 352; *People v. Silveria And Travis* (2020) 10 Cal.5th 195, 258-286 [a trial court is ordinarily not bound by its earlier evidentiary rulings]; *People v. Slayton* (2001) 26 Cal.4th 1076, 1084 ["we do not issue advisory opinions"].) However, we caution that our declination to address this evidentiary issue on the merits should not be interpreted as an agreement with the trial court's ruling.



**APPENDIX B**



## APPENDIX C



BEDSWORTH, J., Dissenting.

I respectfully dissent.

It won't take long. My colleagues have said much I agree with, and they've said it well. What's more, I am not especially enamored of nonsuits or directed verdicts so there are only a few points to be discussed. But my colleagues and I disagree about what is reasonable inference and what is speculation, so I need to address the basis of that disagreement.

The point at which my colleagues and I part company appears to be the fact that *no one knows how this accident happened*.[1] There is neither testimony nor evidence of how Mr. Camacho suffered his tragically serious injuries.[2] All anyone knows is that he was on the scissor lift one moment and on the ground the next. My colleagues are correct that "A trial court cannot grant a defendant's motion for a directed verdict if there is substantial evidence in the record to support the plaintiff's claims. (See *Diego v. City of Los Angeles* (2017) 15 Cal.App.5th 338, 349.)" (Maj. opn., *ante*, at p. 5.) We simply differ about whether that constitutes "substantial evidence."

We know the scissor lift's safety chain was unlatched. My colleagues infer from this that Mr. Camacho forgot to latch the chain, and that since all human beings forget sometimes, the design of the scissor lift was defective because it failed to guard against forgetfulness. I have, as I will explain, problems with that syllogism, but the more important point to me is that the evidence does *not* establish that as a fact; it is

---

[1] My original draft set out these seven words in all caps because my dissent rests almost entirely on this, and I thought if I made that point clearly and early, what followed would be easier to understand. I abandoned that approach because I feared it would send the wrong message about the nature of my disagreement and because I did not want to encourage the practice of using capital letters for emphasis. We see it in briefing all the time, and I offer this suggestion: Athletes are encouraged by shouting; judges are turned off by it.

[2] As the trial court pointed out, in granting respondents' motion "There's also no evidence as to how or why the chain was unlatched. . . ."

1

merely one of the ways the accident could have happened.  It seems to me to be speculation.

Due to his injuries, Mr. Camacho was unable to testify regarding the events, and his coworker, Mr. Figueroa, was never asked why the chain was unlatched. The only person who spoke to forgetfulness was an expert who said people sometimes forget.[3]  But she did not – could not – say that was what happened here, and we have no reason to believe it did.

These two men were not tyros.  Mr. Camacho was new to this employer, but he knew how to operate a scissors lift.  He wasn't pulled out of line at a Starbuck's and asked to give it a try.  He knew how to do it.  The training he received from his new employer was not operational but designed more to reassure the employer that he knew how the lift worked and watch him to make sure he did it safely.  They watched him for a day and a half, and he never failed to engage the safety chain.

While it is possible Mr. Camacho forgot this time, it is at least equally likely that Messrs. Camacho and Figueroa realized they could do the job quicker if the safety chain was out of the way (speculation for which the record provides some support; one of the disadvantages of the toe-plate model my colleagues think might be superior is that it limits the size of the items that can be loaded onto the lift).  Or that they loaded three 60-pound glass panels onto the lift, discovered that in doing so they had trapped the chain behind the first panel, and decided that unloading and re-loading 180 pounds of glass was more trouble than it was worth to get the benefit of a safety chain.  Just this once, they would do without.

That is, of course, speculation.  But it is no more needing of expert testimony than the equally speculative conclusion that they forgot.  And it is bolstered by

---

[3]      A point he was over-qualified to make.

the photo (maj. opn., *ante*, p. 22, Appendix C) that shows the safety chain, clearly visible, right behind the first of those three sheets of glass . . . and then the second . . . and then the third –  requiring an especially robust level of either forgetfulness or myopia.  Human nature is susceptible to more flaws than just forgetfulness, and I am unable to base liability for Mr. Camacho's catastrophic injury on one or another of them without *some evidence* to support it.[4]

"A possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action.  This is the outer limit of inference upon which an issue may be submitted to the jury." (*Jones v. Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 403.)  To my mind, our opinion today goes beyond that limit.  There are plenty of alternative explanations other than forgetfulness here – I feel the two I've discussed are enough to illustrate the universe of possibilities – and to allow a jury to determine this product was defective without anyone having any idea whether forgetfulness played a part in the accident is a bridge too far for me.

This is especially true since the product's safety chain has been determined to be safe by organizations like the American National Standards Institute (ANSI) and Cal/OSHA.  Both have approved this scissor lift with the either the chain guard or with a safety gate.  At trial, ANSI was described as "the voice of the U. S. Standards system for products in the United States."  So we know other experts have concluded this design is safe.

In doing so, they must have been aware that human beings forget.  But if failure to somehow prevent that universal human foible is a design defect, I don't know

---

[4]     It should be noted that the safety gate design advocated for by Mr. Camacho allows the scissor lift to be operated without closing the gate by an operator who wants to get around the size limitation it imposes.  That would  require only that the gate be propped open.  So while the gate might eliminate the human foible of forgetfulness, it does not address our tendency to laziness or expediency.

how we can allow the marketing of anything from mousetraps to jet planes. And unless you are selling to the elderly or others especially susceptible to forgetfulness, I'm not sure I'm ready to require you to failsafe forgetfulness.[5]

It is easy to forget to buckle the seatbelt when you get into your car; we've all been halfway up the street when we realize we've done this. And it would be easy to prevent this potentially life-threatening mistake by making it impossible to start the car without fastening the belt. But we continue to manufacture millions of automobiles with this "design defect." And I am confident I could come up with ways to prevent forgetfulness from endangering people that could be required of countless other products if I had a better imagination or the assistance of an engineer.

But I think the courts have wisely concluded this is something for legislatures – and safety organizations like ANSI and Cal/OSHA – to consider rather than us. So quite apart from the fact there is nothing to make even a prima facie case of forgetfulness here, I do not think we can require most products to be forgetfulness-proof.

And I am not convinced we can justify today's ruling on the basis that we are not saying the product is defective, but rather only that the jury should make that decision. At oral argument, I asked Mr. Camacho's counsel if I was correct that his theory was that "just showing the chain would have prevented the accident wouldn't have been enough" to avoid liability. He said, "Right." He said, "[The chain] is not sufficient because there is another design that would have prevented the accident." So the effect of our opinion is to send this back so those arguments can be made to a jury. I do not think there is basis in law or fact for them in this case.

---

[5] My colleagues say they do not infer that Mr. Camacho forgot to latch the chain (Maj. opn., *ante*, p. 15, fn. 3.) That confuses me. I can't imagine they are taking the position a consumer who makes a *conscious decision* not to use a safety device can sue on the basis that the product is defective because *others* might someday *forget* to use the safety device, but that is the only alternative theory to forgetfulness in this case.

That is the heart of my dissent. I do not think this case could be allowed to go to the jury in the absence of any indication the chain had anything to do with the accident. Mr. Camacho cannot show that had the safety chain been in place he still would have been injured, and he has not shown that he *forgot* to put it in place. While I admire my colleagues' erudition and the exemplary scholarship reflected in their opinion, I cannot agree with them. It's as simple as that; my colleagues and I see it differently.

In deference to tradition, however, I feel I should respond to some of the cases relied upon by the majority. The majority's heavy reliance on *Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112 (*Campbell*) does not help me. In that case, a woman sitting in a seat on a bus was injured when she was violently thrown from her seat as the bus made a sharp turn. (*Id.* at pp. 116-117.) Unlike the seats behind her, the seat she occupied had no horizontal rail or bar that could be grabbed in an emergency. (*Id.* at p. 116.) She testified that she reached for something to hold when she felt herself falling, but "'[there] was nothing there to grab.'" (*Id.* at p. 117.) The court determined that she had presented evidence sufficient to withstand a nonsuit. (*Id.* at p. 122.) "The evidence justified a conclusion that a design feature of the bus – the absence of a restraining bar or pole – was a substantial factor in causing the injury." (*Id.* at p. 125.)[6]

In this case, however, there *was* something there: a chain intended to prevent the very accident that happened – a person falling off the scissor lift. Contrary to the manufacturer's rules, it was not being used because it had been trapped behind the glass panels the plaintiff had loaded onto the lift. As the trial court observed – a fact I have been unable to get past – Mr. Camacho could not show that he would have fallen out even if the chain had been latched.

---

[6] It is also worth noting that the plaintiff in *Campbell* was relying on the consumer expectation test as her theory of product defect. (*Campbell, supra,* 32 Cal.3d at p. 125.)

My colleagues adopt the theory that the reason the chain closure is a product defect is that the safety gate would eliminate forgetfulness; that is, it would eliminate the possibility that a worker would forget to latch the chain. But it would not eliminate the possibility a lazy employee might choose not to use it, or an employee hurrying to complete his task or encumbered by the gate's limitation on the size of material that could be loaded onto it would choose to prop it open. And since *we do not know what happened here*, we cannot say a safety gate would have prevented Mr. Camacho's injury – or anyone else's – if the gate were left open for some reason other than forgetfulness.

I cannot find any case in which a safety device approved by industry standards and complying with government regulations has been found to be defective because another, purportedly safer, design was available. In the cases my colleagues cite to support causation, *Campbell, supra,* and *Buccery v. General Motors Corp.* (1976) 60 Cal.App.3d 533 (*Buccery*), there was no safety device at all.[7] In this case, however, there was a safety device, and it was not used.

For me, *Visueta v. General Motors Corp.* (1991) 234 Cal.App.3d 1609 (*Visueta*) illustrates this point. In *Visueta*, the plaintiff alleged that a truck's parking brake lever was inaccessibly placed, causing an accident when the truck was unable to stop after failing to make a turn. The truck struck a car, killing the driver. (*Id.* at p. 1612.) A subsequent California Highway Patrol investigation showed that "the hydraulic brakes were improperly maintained and the parking brake was in disrepair and inoperable. The parking brake lever played no part in the accident. At no time did [the truck driver] use or even attempt to use the parking brake." (*Id.* at p. 1613.)

---

[7] In *Buccery, supra,* the truck the plaintiff was driving had no head rest behind the driver's seat. A rear-end collision caused the plaintiff's head to strike the window in the back of the cab, injuring him. (60 Cal.App.3d at pp. 536-537.)

6

The court held that "[t]he undisputed facts demonstrate lack of causation between the claimed design defect and [the car driver's] death as a matter of law." (*Visueta, supra,* 234 Cal.App.3d at pp. 1612-1613.) The placement of the brake lever could not have caused the accident because the truck driver never tried to use it. Maybe the parking brake lever's placement was a defect, but any such defect could not have caused *that* accident. (See also *Miranda v. Bomel Construction Co., Inc.* (2010) 187 Cal.App.4th 1326, 1337-1339 [expert testimony established general, not specific, cause for injury].)

In this case, Mr. Camacho's theory of causation rested on the idea that human error – specifically forgetfulness – which JLG's chain design did not preclude, caused the accident. Evidence of whether Camacho and Figueroa forgot to latch the chain or whether instead they decided it was too much trouble to unload the glass panels to free it was therefore crucial to this theory of causation.[8] There was no such evidence. (See *Westside Center Associates v. Safeway Stores 23, Inc.* (1996) 42 Cal.App.4th 507, 530-531 [expert testimony not based on record].)

As for the adequacy vel non of the warning label, we are again back to the fact there is no evidence to support the theory. No one will ever know if Mr. Camacho saw the warning label. There is neither testimony nor evidence on that point. Like the parking brake in *Visueta*, there is no evidence it had anything to do with what happened to him. What we do know is that he was instructed on the use of the chain, he was told to use it, he was observed using it for a day and a half, and the warning label was clearly visible.

What's more, my colleagues' theory is that a jury might conclude the scissor lift was defective because it failed to prevent a user from forgetting to use the

---

[8] Camacho's expert agreed that liability could not be imposed if a user defeated a safety device, for example, by tying the self-closing gate open.

safety chain. I am unable to imagine how a warning label could be worded so as to prevent someone from forgetting something. "Don't forget" is one of the least effective admonitions in the English language.

"A directed verdict may be granted only when, disregarding conflicting evidence, giving the evidence of the party against whom the motion is directed all the value to which it is legally entitled, and indulging every legitimate inference from such evidence in favor of that party, the court nonetheless determines there is no evidence of sufficient substantiality to support the claim or defense of the party opposing the motion, or a verdict in favor of that party. [Citations.]" (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 629-630.) The trial court resolves conflicts in the evidence against the moving defendant and gives to the plaintiff's evidence all the value to which it is legally entitled. The ultimate question is whether the plaintiff has presented sufficiently substantial evidence to support a verdict in his favor. (*Fountain Valley Chateau Blanc Homeowner's Assn. v. Department of Veterans Affairs* (1998) 67 Cal.App.4th 743, 750-751.)

"The rules governing the granting of a nonsuit[9], however, do not relieve the plaintiff of the burden of establishing the elements of his case. The plaintiff must therefore produce evidence which supports a logical inference in his favor and which does more than merely permit speculation or conjecture. [Citation.] If a plaintiff produces no substantial evidence of liability or proximate cause then the granting of a nonsuit is proper." (*Jones v. Ortho Pharmaceutical Corp., supra,* 163 Cal.App.3d at p. 402.)

---

[9] The same test applies to a nonsuit as to a directed verdict. "It has become the established law of this state that the power of the court to direct a verdict is absolutely the same as the power of the court to grant a nonsuit. A nonsuit or a directed verdict may be granted 'only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given.' [Citations.]" (*Estate of Lances* (1932) 216 Cal. 397, 400.)

I believe the evidence adduced in the court below did no more than permit speculation or conjecture.


BEDSWORTH, ACTING P. J.